IN THE UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

ESTATE OF JAMES QUIGLEY,
CLAIRE QUIGLEY, Administrator

    Plaintiffs

    V.

                               Docket No. 1:04-cv-277

KATHLEEN LANMAN
LAWRENCE McLIVERTY
DAVID IBEY
STEVEN ANDREWS
CHARLES HATIN
RAYMOND FLUM
JOHN DOE, aka D-Wing correctional officer
DR. PAUL COTTON
PAUL COTTON, P.C.
MATRIX HEALTH SYSTEMS
VERMONT DEPARTMENT OF CORRECTIONS

    Defendants

## COMPLAINT

COMES NOW the Plaintiff, Claire Quigley, administrator of the Estate of James

Quigley, and does hereby complain against the above-captioned Defendants as follows:

### Jurisdiction and Venue

1.  This action is brought, in part, pursuant to 42 U.S.C. § 1983 for deprivation of

plaintiff's constitutional civil rights; jurisdiction is therefore appropriate under 28 U.S.C.

§ 1331 and § 1343. The claims asserted herein arose in the District of Vermont, and

venue is therefore proper under 28 U.S.C. § 1391(b);

SLEIGH & WILLIAMS
ATTORNEYS AT LAW
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

<u>Complaint</u>

2.  Plaintiff Claire Quigley is the administrator of the Estate of James Quigley;

3.  Defendant Kathleen Lanman is, and for all times pertinent hereto, superintendent of the Northern State Correctional Facility (NSCF), Newport, Vermont;

4.  Defendant Lawrence McLiverty  is, and for all times pertinent hereto, director of security, Vermont Department of Corrections (DOC);

5.  Defendant David Ibey  is, and for all times pertinent hereto, the Living Unit Supervisor for D-Wing at the Northwest State Correctional Facility (NWSCF), St. Albans, Vermont;

6.  Defendant Steven Andrews is, and for all times pertinent hereto, the Corrections Services Specialist at NWSCF, in St. Albans, Vermont;

7. Defendant Charles Hatin is, and for all times pertinent hereto, superintendent of NWSCF in St. Albans, Vermont;

8.  Defendant Raymond Flum is, and for all times pertinent hereto, the person in charge of classification for the Vermont Department of Corrections and was responsible for interstate prisoners housed in Vermont under the Interstate Prisoner Compact;

9.  Defendant David Ibey was for all times pertinent hereto a correctional officer employed by the DOC at NWSCF in St. Albans, Vermont;

10.  Defendant John Doe aka D-wing corrections officer is, and for all times pertinent hereto, a correctional officer employed by the Vermont Department of Corrections at NWSCF in St. Albans, Vermont;

11.  Defendant Paul Cotton, is, and for all times pertinent hereto, has been responsible for providing mental health services to incarcerated Vermont inmates and has been an employee and/or principal of Defendant Matrix Health Systems and Paul Cotton, P.C.;

12.  Defendant Paul Cotton, P.C., is, and for all times pertinent hereto, a Vermont Corporation contracted by the Department of Corrections to provide mental health services to incarcerated Vermont inmates;

13.  Defendant Matrix Health Systems is, and for all times pertinent hereto, a Vermont Corporation contracted by the Department of Corrections to provide mental health services to incarcerated Vermont inmates;

14.  Defendant, Department of Corrections, is, and for all times pertinent hereto, the state agency responsible for the custody of incarcerated Vermont inmates;

15.  James Quigley died at the Northwest State Correctional Facility in St. Albans on October 7, 2003. Mr. Quigley committed suicide by hanging himself in his cell;

16.  At the time of his death, James Quigley was  housed in a cell that did not permit full-time and/or complete observation by correctional staff;

17.  Said cell had been the scene of previous inmate suicides and/or suicide attempts;

18.  The cell's design was known to be defective by Defendant DOC, it's employees and/or agents in that it did not permit adequate observation of potentially suicidal inmates and was further known to be dangerous to such inmates as it provided the means and/or opportunity for hanging;

19.  James Quigley, a Florida inmate, was serving a life sentence with a twenty-five year minimum for murder and attempted murder. Mr. Quigley

came to the Vermont Correctional System through an exchange under the
Interstate Prisoner Compact between the States of Florida and Vermont.
Mr. Quigley began his sentence in 1980. he was transferred to Vermont
under the Compact on February 11, 2001.;

20. Upon his arrival in Vermont, the Department classified James Quigley as a
medium security prisoner and assigned him to the Northern State Correctional Facility
in Newport;

21. In March of 2001, a correctional officer intercepted mail addressed to James
Quigley and discovered detailed maps. The maps had been downloaded over the
internet from MapQuest depicting the route from the Newport prison to Florida. The
maps included a detailed route to James Quigley's home in Atlantic City, New Jersey.
The maps also showed the driving distance and time;

22. When asked about these maps, James Quigley stated that he had obtained
them from an acquaintance from outside of the correctional system to document the
distance between Newport and Florida. James Quigley was citing that distance as the
reason for a Florida court to provide him with additional filing time in connection with
a post-conviction release petition;

23. Maps with similar or greater detail were available at the prison library

24. Upon discovering these maps the Deputy Superintendent confronted James
Quigley. James Quigley provided the explanation. The Deputy Superintendent found
the explanation to be reasonable. He allowed James Quigley to keep the portion of the
MapQuest printout that listed the total mileage between Vermont and Florida. He
confiscated the remainder of the maps. There is no record of any discipline for this
event;

25. For some of the time that he was in Newport, James Quigley served as the Law Librarian. He was removed from that position in August of 2002. James Quigley. He appealed the Level 1 grievance and the decision was overturned. He was restored to his position at the law library;

26. James Quigley assisted a number of other inmates in preparing legal grievances and lawsuits. James Quigley himself was the author of a number of grievances. James Quigley filed thirty-six grievances between September 13, 2001 and his departure from the Newport facility on July 17, 2003;

27. James Quigley was a member of the inmate recreation committee. The committee allocates, with the approval of the superintendent, expenditures of funds for inmate recreation. In May of 2003, James Quigley and another inmate rejected a proposal to purchase flowers from the fund. The Superintendent supported the proposal. The flowers were subsequently purchased;

28. The Superintendent removed James Quigley from the committee in June of 2003. James Quigley alleged that it was in retaliation for his refusal to approve use of inmate funds for the planting of flowers on the facility grounds. The articulated reasons for removing James Quigley were: a) he had served on the committee for two years and other inmates should be given the chance to serve; and, b) the inmates from other states were not representing the interests of Vermont inmates;

29. James appealed his removal from the rec committee to central office. It was returned with a note that it had not been adequately dealt with at the facility level. The day  following return of the level 3 grievance to the facility, the charges relating to escape were made;

**Administrative Segregation in Newport**

30. On June 10, 2003, James Quigley had a parole hearing with a representative of the Florida Parole Board. The hearing was by telephone;

31. Following the hearing, James Quigley's case worker at the Newport facility spoke with him and concluded that James Quigley was upset with the outcome of the hearing. The hearing established that the Florida Parole Commission would not consider James Quigley for parole for another ten years;

32. Simultaneously, the deputy superintendent received information from an informant that James Quigley had a "back-up plan";

33. The deputy superintendent concluded that James Quigley was a risk of escape and placed him in administrative segregation on June 10, 2003;

34. Administrative segregation places significant additional restrictions on inmates. Inmates in the general population share a cell with another inmate and may circulate through portions of the facility for part of the day. Inmates in administrative segregation are housed alone in a cell. They may leave their cell for one hour a day with strict limitations that do not allow them to leave the segregation unit;

35. Department of Corrections policies require hearings for administrative segregation placements. There must also be a finding, supported by evidence, of a violation of a Department policy;

36. A hearing officer within the facility conducted a hearing. On June 16, the hearing officer recommended the release of James Quigley from administrative segregation because there was insufficient evidence to deem him an escape risk;

37. Shortly after this hearing the deputy superintendent searched the property taken from the cell James Quigley had occupied prior to his placement in administrative segregation. He wrote the following e-mail to Defendant Lanman on June 16:

> I spent time shaking down Quigley's property yesterday afternoon. I found maps of Vermont and all of the counties. There were all from the newspaper. I did not find any escape plan or anything suggesting he was putting anything together. What we do have is an interstate compact inmate who was just given information that he will more than likely serve another ten years prior to any consideration for parole. While it is difficult to tell if he did in fact have any thoughts of escape the information we did receive came from three sources. One officer received two of the tips but finds his sources reliable. Having the information come from several sources does suggest that something must have been said even if out of frustration at bad news. Approximately one year ago, could be longer, I was given some maps from Quigley's mail. They were from Map Quest. They were actual maps off the internet from the facility to Florida. When questioned James stated he did not know they were coming. Now an informant is stating that Quigley stated he had a backup plan when parole fell through. I am recommending that we leave Quigley in SMU on open status. It is not close custody, he will remain medium. This will allow the facility to monitor his behavior until the final parole decision has been made. Something about he can appeal. Leave him there and review in thirty days;

38. Although this new information was not part of the record of the administrative segregation case, Defendant Lanman considered the information and overrode that decision on June 17. Defendant Lanman ordered that the Administrative Segregation status continue until a further review in fifteen days;

39. On June 17, Defendant Lanman also sent an e-mail to Defendant Raymond Flum, who was in charge of classification and responsible for interstate prisoners, and Defendant McLiverty. The e-mail states:

> Ray, Quigley is an ISC from Florida. We AD SEG'd him last week because we received CI info that he would get out of here one way or another. We took this serious because he received information from Florida Parole that they would probably make him do ten more years and then consider him for parole. This obviously did not make him happy . He also has cost medical lost of money due shoulder injuries. We caught him on video in the gym using the weights and actually completed four sets. He's been told by Dr. Peterson not to go to the gym. He is being weaned from his medicine. Dave shook down his property

yesterday arid found a full map of Vermont and individual cutouts of each county of Vermont. At this point he is an escape risk. I'm requesting that he be sent back to Florida. I dealt with ISC as a CSS and LUS and know that they have to take him back if we request it. It's part of the ISC compact. At this point nothing has been entered into case notes. Thanks, K ;

40. On June 18, Defendant Flum replied:

Kathleen, The ISC is a relationship piece. We can say take him back because we say so, and they can do the same with us. However, we try not to operate that way because generally the ones we send out are far worse for us than the ones we get in. In this particular case they have agreed to take [name deleted] and keep him in one of their close custody facilities, so it is not as simple as take him back because I say so. With all that in mind, please provide me with any and all paperwork that you have on this guy and these situations that you refer to and I will work with Florida. As far as the medical costs, these can be billed back to Florida if they are extraordinary, that is not reasonably included in normal maintenance. What brief info you supplied below might indicate that we could bill Florida for those costs. Have medical send me the information and I will work with Florida. Thanks, Ray ;

41. On June 18, Mr. McLiverty replied: "If you can't move him florida, right off-send him to Northwest until you can.";

42. James Quigley appealed the administrative segregation decision to John Murphy, the Director of Grievances and Appeals. John Murphy screens appeals from facilities to the Commissioner, which are Class 3 Grievances;

43. John Murphy remanded the case to the Newport Facility for another hearing. John Murphy concluded that the hearing record was inadequate to support that there was an escape risk because there may have been improper use of information from a confidential informant and consideration of information outside of the record;

44. On July 1, 2003, another hearing officer within the facility held a second hearing. The hearing officer considered the evidence from the search of James Quigley's

property. The hearing officer recommended that James Quigley continue in administrative segregation. Defendant Lanman approved this decision on July 2, 2003;

45. James Quigley then appealed this decision to John Murphy;

**Transfer to St. Albans and Close Custody**

46. While James Quigley's appeal was pending, John Murphy suggested to Defendant Lanman that James Quigley should be transferred to the St. Albans Facility. John Murphy observed that Defendant Lanman considered James Quigley to be an escape risk and James Quigley had significant grievances with that superintendent. John Murphy thought it might make sense for James Quigley to get a fresh start in a new facility. NWSCF is Vermont's most secure facility and therefore better equipped to deal with potential escape risks;

47. Department policies require the review of administrative segregation decisions within fifteen days. Unless there is evidence to support continued administrative segregation the inmate returns to his or her previous status. James Quigley was scheduled for such a review on July 17, 2003;

48. On July 15, 2003, Corrections Department employees Blanchard, Morley and Martinson of the Newport staff met to discuss James Quigley. The case note describing the meeting reads in pertinent part:

> "Discussion was had in regards to placement of Mr. Quigley should the Administrative review allow him to return to general population and/or not. The plan from this group was for inquiry to movement to NWCF [the St. Albans facility] if the Due Process Hearing allows Mr. Quigley to return to general population status. If the decision is for continued Administrative status then he will be reviewed for continued placement in the SMU unit." ;

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

9

49. Thus, regardless of the outcome of the review of James Quigley's administrative segregation, the plan was to continue some form of restrictive custody;

50. Administrative segregation confinement and close custody confinement both occur in restricted areas with substantial limitations on inmates. Close custody inmates have some additional time out of their cells. Administrative segregation is a punishment that is subject to hearing and appeal. Close custody status is considered a classification decision and is not subject to appeal;

51. On July 17, the review of James Quigley's administrative segregation occurred. The written review states: "Facility has no new evidence to present. Recommend remove from ad. seg. status." Defendant Lanman concurred at 8:20 AM;

52. The case notes for July 17, 2003 read: "James Quigley has been reviewed by the Administrative Due Process this morning and the determination has been to discontinue the Administrative Segregation. The Superintendent has concurred with this decision. The case plan has now been reviewed and Mr. Quigley has been overridden to close custody and is currently being moved to the NWCF for close custody housing. Further case planning will be developed through the NWCF and be determined by Mr. Quigley's behavior.";

53. There is no written evidence in the James Quigley file documenting how the staff at NSCF decided to change James Quigley's custody status. The digital record of the Department documents that the change occurred on July 17, 2003; the record does not document the person who made the change. Generally, the Department policy requires the classification occur through an assessment tool called the Conviction and Violation Summary. This tool generates a numeric score; higher scores correlate to greater risk and more restrictive custody. The custody level can be increased through

an override of the score. The Department's written policies do not explain how these judgments should be made;

54. On July 17, James Quigley transferred from NSCF to NWSCF in St. Albans. Just prior to the transfer the staff at NSCF told him that he was no longer on administrative segregation, but that his custody status had been changed to close custody;

55. Generally the transfer of inmates between facilities requires approval by the Department's Director of Classification or his deputy and written documentation of that approval. The record of James Quigley's transfer does not document such approval. The transfer document indicates that Defendant David Ibey from NWSCF and Marshall Rich from NSCF arranged the transportation. Defendant Lanman signed the order for the transfer;

56. The only other written material concerning the transfer is a June 18, 2003 e-mail from Defendant Lawrence McLiverty, quoted above in paragraph 35, the Department's Director of Security, to Defendants Kathleen Lanman and Raymond Flum, who was in charge of classification decisions;

**Northwest State Correctional Facility's D-Wing**

57. Upon arrival at NWSCF, the staff assigned James Quigley to the D-Wing as a close custody inmate;

58. The D-Wing at NWSCF has two parts. The first part houses inmates with mental health problems and profound behavioral issues associated with them. The

second part is a close custody unit. D-Wing is very high security, housing inmates in

solitary cells;

   59. NWSCF has a written policy governing D-Wing. It is called: "Close

Management Program Delta-Unit Offender Manual." James Quigley was a Level-f

inmate under this policy. According to the manual, James Quigley was supposed to be

out of his cell each day for one twenty minute phone call, shower, and two activity

periods totaling between four and five hours;

   60. According to the policy, inmates are not penalized for their past behavior:

   The Close Management Program's primary purposes: Create an environment
   that is highly structured, allows graduated opportunities, closely monitors
   behavior & human interaction and supports offender efforts as self -risk
   management. Most offenders are assigned to the unit because of issues or
   problems that occurred in medium/open population. The Close Management
   Program offers offenders an opportunity at intervention: the chance to take a
   time out, reflect and learn to manage "risk" behaviors.
   Regardless of the offenders (sic) incoming status, punishment is not the goal.
   Even if the offender arrives in the unit because of serious behavior resulting in a
   disciplinary report, the goal is the same: enter, serve, sanction, learn and leave
   better equipped to manage your own behavior;


   61. The policy goes on to read:

   Each offender who demonstrates progress and effort toward self-risk
   management will be continuously reviewed by the Close Management Team
   and offered the opportunity for increased privileges and will move ever closer to
   returning to medium custody/open population;


   62. The policy goes on to read:

   Level (I) is designed to be short-term -30-days in duration;

   63. James Quigley was on D-Wing for 82 days;

64. The weekly minutes for the D-Wing management team between July 21, 2003 and October 6, 2003 describe no misbehavior by James Quigley. The regular descriptions for James Quigley were: "quiet" and "no issues." ;

65. The weekly minutes for the D-Wing management team between July 21, 2003 and October 6, 2003 describe a "movement list." This was the list of inmates, in order of priority, who were next to move out of D-Wing. Prior to October 6, James Quigley was never on this list;

66. Defendant David Ibey is the Living Unit Supervisor for D-Wing and was a member of the D-Wing Management Team. In two interviews with Vermont Agency of Human Services investigators, Defendant Ibey explained his understanding of why James Quigley remained in D-Wing. Defendant Ibey said James Quigley had an escape plan. Defendant Ibey described James Quigley as "a pain in the butt." When asked if "pain in the butt" meant the filing of grievances, Defendant Ibey told the Agency investigators "yes.";

67. Defendant Steven Andrews was the Correctional Services Specialist at NWSCF who functioned as the caseworker on James Quigley's file. He also served on the D-Wing management team;

68. Both Defendant Andrews and Defendant Ibey stated that there was an understanding on the D-Wing management team that James Quigley would stay in D-Wing until a transfer to Florida. Thus, the team would make no decision on reviewing Mr. Quigley's custody status or moving him out of D-Wing. He would stay there indefinitely regardless of his good behavior;

SLEIGH & WILLIAMS
ATTORNEYS AT LAW
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

13

69. The notes for the D-Wing management team for August 25, 2003, state the following concerning James Quigley: "Security needs to review for medium placement. On Administrative Segregation status. Status should be reviewed. Quiet." ;

70. James Quigley was not on administrative segregation; that would have required more hearings and appeals. He was on close custody. Inmates on close custody, according to policies, are allowed to leave their cells for up to five hours per day. If they are on administrative segregation, they are only allowed to leave their cell for one hour per day;

71. A review of the daily logs of the facility by the Agency investigators indicated that James Quigley was not out of his cell for five hours a day. There are no records for fourteen days. Out of the other sixty-eight days he was on D-Wing, the records document that James Quigley was out of his cell in the activity room for only twenty-one days. He may also have been out of his cell for a twenty-minute shower. It is possible that James Quigley refused opportunities offered to be out of his cell. James Quigley's correspondence contains complaints that he was not allowed out of his cell;

72. The conditions in D-Wing are much harsher than conditions for the general population. The inmates occupy solitary cells.  Inspection shows that windows in D-Wing are drafty. James Quigley did not have access to standard items available to the general population, such as dental floss or standard toothbrushes. James Quigley did not have access to standard writing implements.  Quigley was not allowed his usual clothes, but was required to wear an orange jump-suit with short sleeves. In his correspondence, he reported that the  temperature in D-wing was excessively hot in the summer and cold in the early fall, dropping into the 40's. For bedding he was provided with only a sheet. In his correspondence he reported spending his time huddling under

the sheet and shivering. James Quigley also complained that he did not have access to his full legal file; he had a post-conviction relief proceeding pending. James Quigley did not have access to outside recreation or exercise";

## Florida Transfer and Grievances

73. On July 22, 2003, the staff at NWSCF printed a copy of the Conviction and Violation Summary review from the Department's data base and placed it in James Quigley's file. There was no new review. The staff at NWSCF attached the staff notes from NSCF to the review, and wrote "override---close" at the bottom of the page;

74. On July 22, Defendant Steven Andrews, the case worker on James Quigley's file wrote the following e-mail to Defendant Flum and several others:

Everybody-----Inmate James Quigley was transferred from Newport to NWSCF on 7/17/03 as a higher degree of security was needed. Information revealed that inmate Quigley was considered to be an Escape Risk as he had local Vt. Maps in his possession and directions from MapQuest from Newport to Florida. Confidential information received was also used to place Quigley in AD/SEG/increase his custody level/and eventually place him here at NWSCF. I'm unfamiliar with the ISC agreement/rational with Florida, but it appears to me that if this inmate requires more attention and a higher degree of security--- why are we keeping him here in Vt???? Currently inmate Quigley is in "D" unit/Close Custody as he has been overridden by the Newport officials. Future plans for this inmate would be limited as he is currently considered a security risk. Why waste a Vt bed on an ISC inmate Who we feel is a security/escape risk???? Can inmate Quigley be sent back to Florida for a swap if we still owe Florida??? Direction requested--- Thanks---SA Note: Quigley is a lSC/Florida inmate serving a 25y to life for 1st Degree Murder--recently denied Parole-has been in Vt since 02/11/02.

75. That same day, Defendant Flum replied:

Steve and all, When the information first came to light, I asked for any and all supporting documentation so that I could work with Florida. To date I have not received any material that I can work with Florida on. Our swap with Florida is

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

[inmate name]! I will make the same request, get me any and all information that is relative to making him a high risk for escape and I will work on a new deal with Florida. Thanks, Ray

76. Defendant Andrews immediately wrote back:

Ray--Your request will be in the mail today---A conversation with Newport could also shed some light on this case. SA

77. Mr. Flum then replied:

Steve , I wrote the e-mail the way I did, because I have already spoken to Mac and the NSCF staff. My original request for information went to them. At the time, they were not real clear on the issues. Is there truly an escape attempt or do we simply want to get rid of him for other reasons?
I hope this helps'? Ray

78. Defendant Andrews then replied that same day:

If the VT/DOC approves a Custody override up to Close and also approves a move to a more secure facility for an ISC person--obviously there is a concern. One questions if VT really needs to deal with this type of inmate. I known in past practice that if a ISC inmate sneezed wrong--he was headed back from which he came and generally our ISC inmates abided by our standards. ISC placement is a privilege and should be honored by the inmate to the fullest. Again several individuals obviously have some concerns or the inmate wouldn't be in Close Custody w/override and placed here. Return to Florida seems appropriate. SA

79. On July 21 and 22, 2003, James Quigley grieved the changes in his custody level and the resulting placement in D-Wing. James Quigley complained that his change in status by Defendant Lanman was retaliatory. Defendant David Ibey of NWSCF denied the grievances. Defendant Ibey wrote that he had consulted with Defendant Lanman, and that his review of the core file showed the change was appropriate. Defendant Ibey wrote that James Quigley would "have to earn his way out of close custody ." ;

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

80. Defendant Hatin reviewed the decision and concurred with Defendant Ibey. Defendant Hatin wrote that James Quigley could earn his way out of D-Wing and into the general population by "appropriate behavior" and "cooperation." ;

81. On July 27, 2003, James Quigley filed a grievance requesting a soft toothbrush. There was a policy on D-Wing that only allowed inmates a miniature tooth brush. On July 28, Officer Mahoney denied the grievance stating: "Maintain appropriate behavior for movement out of Delta." Defendant Hatin upheld this decision on July 31, 2003;

82. Defendant Hatin told Agency investigators that he routinely uses terms such as "appropriate behavior" and "cooperation" in denying grievances;

83. When the grievances were denied, James Quigley had no disciplinary record, no infractions, and no violations within the NWSCF. Throughout his stay at the NWSCF, he had no disciplinary record, no infractions and no violations. His disciplinary record at NSCF included one disciplinary report, but was generally clean;

84. During his stay at NWSCF, no explanation was provided as to what James Quigley needed to change so that his behavior would be appropriate or cooperative. The only apparent non-cooperation on James Quigley's part was the filing of grievances and lawsuits;

85. Each week a management team reviewed the status of inmates on D Wing. That team was supposed to initiate the process to move Level I inmates after thirty days if their behavior was good and they therefore met the criteria for movement. The team included Defendants David Ibey and Steve Andrews. The team never initiated that process;

86. Mr. Andrews wrote the case notes for James Quigley's case while he was in the NWSCF. On July 28, Defendant Andrews wrote: "DMT[D-Wing Management Team]-Inmate Quigley is a ISC [Interstate Compact] inmate who was transferred from Newport for Close Custody-overridden from medium-per Newport-Security issue maps in his possession and informants stated that he was going to Escape. I have written Ray Flum and made a case that this inmate should return back to Florida as he is a security risk-no word back yet." ;

87. The last part of the case note written by Defendant Andrews reads: "This inmate likes to write tons of grievances (sic) over petty issues. Also a legal paper pusher." ;

88. On July 28, 2003, Defendant Andrews spoke with James Quigley about writing grievances. Defendant Andrews stated that he asked James Quigley if he was going to do the same thing here, meaning, to file many grievances. James Quigley had no response. James Andrews explained his comment by stating that he wished to have issues settled at initial stages. James Quigley reported that the comment by Defendant Andrews was: "Why do you write so many grievances? Don't you like it here in Vermont?" ;

89. On August 22, 2003, Defendant Andrews again e-mailed Defendant Flum. The e-mail reads:

> Ray---It's been 30 days since we had any communication regarding inmate Quigley and the request for his ISC return to Florida. Any progress relating to his possible return?? Inmate Quigley continues to occupy a valuable close Custody bed and has done so since 7/20/03. ----Awaiting your response. ----SA

There is no record of any reply by Defendant Flum;

90. On September 2, 2003, Defendant Andrews sent another e-mail to Defendant Flum and his deputy, Charles Remick. The e-mail reads:

> Ray/Charles I hate to be a pain--but somebody needs to make a decision on this case. I may not know all the circumstances as to why Inmate Quigley is here via ISC; but during the past 60 days Quigley has become a high case. Again, in my opinion--this inmate should either return to Florida or another State. -----SA

91. This resulted in the following exchange:

[Flum to Andrews] My last conversation with your facility in regards to this case was a request for information. I was told that a package would be sent my way. I have not seen any package as of yet. Ray

[Andrews to Flum] Ray---I sent the packet to you on 7/22/03 ----SA

[Flum to Andrews] Sorry to say, but no one in this office has seen it. did you send it, to who's attention was it sent? St .r address or Waterbury address? Sorry Ray

92. Defendant Flum's files contain a set of documents that Defendant Andrews apparently sent him at some point, although there is no cover letter. The set includes documentation concerning James Quigley's administrative segregation hearings at NSCF, the outcome of his parole, and his Florida conviction record. There is no new information concerning James Quigley risk of escape;

**Review of D-Wing Placement and Classification by Department of Corrections**

93. James Quigley appealed the denial of his grievances questioning his placement in D-Wing and the conditions of his treatment there;

94. Faced with an accumulation of grievance appeals, John Murphy met with James Quigley on September 10, 2003. The next day, John Murphy prepared a

memorandum that he gave to his immediate supervisor, Defendant Lawrence McLiverty, the Director of Security for the Department of Corrections;

95. The September 11 memo states: "The purpose of this memo is to apprise you of the possibility that Mr. Quigley is being retaliated against for his grievance activity." The memo reviews some of the history of Mr. Quigley's placement, his case notes and his grievances. The memo concludes: "Since some of his grievances speak to retaliation and the fact that his allegation gains credibility by the actual case note entered by Mr. Andrews on the day of the treatment team meeting, I believe that a determination needs to be made about the possible employee misconduct before I can craft a response to his most serious issues regarding retaliation. Please advise." ;

96. In response to the memorandum, Defendant McLiverty instructed John Murphy to immediately go to NSCF to investigate the reliability of the assertion that James Quigley was an escape risk;

97. On September 12, James Murphy traveled to the NSCF. He learned that the confidential informant never said that James Quigley was planning an escape. He had only stated that James Quigley had a "plan B." ;

98. John Murphy knew that James Quigley filed many legal proceedings, not only challenging conditions within the prison but also contesting his own incarceration. John Murphy did not know that at that time James Quigley had won a court case entitling him to an evidentiary hearing on a post-conviction relief proceeding. Thus, at that time, James Quigley had a live legal proceeding challenging his conviction and his incarceration. Legal challenges to his incarceration could well have been the "plan B" referred to by the informant;

99. The maps that were the alleged basis for James Quigley's being declared an escape risk were from the Rutland Herald. They showed the State of Vermont, with some of its roads depicted and a numbered key showing the various locations of advertisers. James Quigley also had county maps from a newspaper which apparently had been part of election coverage; they showed the political boundaries of various towns within Vermont counties;

100. The Rutland Herald and other papers that were routinely delivered to prisoners at Newport occasionally published similar maps. The library in the Newport Facility also maintained books with maps of Vermont containing comparable detail;

101. On September 12, Mr. David Martinson, the Deputy Superintendent at the NSCF made the following comment to John Murphy: "The only reason that guy [Mr. Quigley] is in ad seg is he pissed off the superintendent.";

102. Following his visit to NSCF, John Murphy verbally reported back to Defendant McLiverty on September 12. He reported that there is more evidence that James Quigley is currently in D-Wing in retaliation than because he is an escape risk;

103. On September 17, 2003, Defendant McLiverty sent an e-mail to Defendant Hatin, the Superintendent at NWSCF. The e-mail stated: "Quigley-what did Newport send you about this guys situation. I'm thinking that he doesn't belong in D-block but wanted to review the materials that resulted in him being viewed as an escape risk.";

104. On September 19, 2003, Defendant McLiverty sent a three paragraph e-mail to Defendant Hatin. The second paragraph reads: "Quigley and [another inmate name] don't need to be housed in D block. These are thin cases of escape risk from Newport that I can staff with you. There probably are no DR's [disciplinary reports] for escape."

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

21

105.  On September 25, 2003, Defendant McLiverty wrote Defendant Hatin a letter concerning James Quigley and another inmate. The letter reads: "I would like the administrative segregation status of these two residents reviewed. I would like to be consulted about the findings of these reviews, when they are completed. Thank you.";

106. On September 29, Defendant Hatin replied in a letter that, in pertinent part, reads: "I have looked into your request and found the following: James Quigley-not on Administrative Segregation Status.";

107. On October 1 and 2, 2003, John Murphy again went to the NWSCF to investigate allegations that a correctional officer was mistreating inmates within the D-Wing. John Murphy's investigation documented that there was substantial evidence that Defendant John Doe was mistreating inmates in D-Wing. According to John Murphy, the evidence did not indicate that James Quigley himself was the subject of mistreatment. It indicated the mistreatment was directed towards inmates who had profound mental health disabilities;

108. The Agency's investigation after James Quigley's death has documented that inmates have alleged that the same correctional officer mistreated James Quigley. The mistreatment included withholding showers, recreational time, and personal items. James Quigley's own correspondence documents that he believed he was being mistreated by this correctional officer;

109. One of the inmates said that James Quigley complained to Defendant John Doe about his food. The inmate reported to Agency investigators that Defendant John Doe replied: "If you don't like it, string up." This expression means to commit suicide by hanging. The same inmate reported that Defendant John Doe made this comment on many occasions;

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

110. That Department of Corrections reassigned Defendant John Doe to a different post within the facility on October 13, 2003. The Department relieved the officer from duty with pay on November 13, 2003;

**The Plan to Move James Quigley**

111. In September 2003, Attorneys Paul Volk and Jason Sawyer were investigating whether to represent James Quigley in a civil rights action for damages based upon his confinement in administrative segregation in NSCF and then close custody in D-Wing. James Quigley had also filed a case in court questioning his confinement in D-Wing. Attorneys Volk and Sawyer did not represent James Quigley in this case;

112. A day or two before October 2, 2003, Jason Sawyer spoke with Robert Gagnon, an attorney from the Vermont Attorney General's office who was representing the Department in the defense of James Quigley's court case. Jason Sawyer stated that he thought James Quigley had been placed in D-Wing as retaliation. He also objected to some of the conditions of confinement within D-Wing. Robert Gagnon did not agree or disagree, but promised to get back to Jason Sawyer;

113. Robert Gagnon called Jason Sawyer back on October 2. Jason Sawyer understood Robert Gagnon to indicate that there was a process in place to move James Quigley to a list that would result in his transfer out of D-Wing. Jason Sawyer called James Quigley that day and gave him this news;

SLEIGH & WILLIAMS
ATTORNEYS AT LAW
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

23

114. Robert Gagnon organized a telephone conference on October 6, 2003. The other participants were John Murphy, Defendants Hatin and McLiverty, Mr. Flum, and Mathew Viens of the Attorney General's office;

115. In the telephone conference, John Murphy laid out the reasons why he believed the placement of James Quigley was unsupported. Defendant Hatin did not respond to the explanation in what John Murphy regarded as a rational manner. Instead of dealing directly with the evidence that James Quigley was not an escape risk, Defendant Hatin commented that he was not going to allow a convicted murderer from Florida into his general population and then someday have to explain to a local selectman why that murderer had escaped;

116. Robert Gagnon's notes indicate that it was decided that Quigley would be moved from D-Wing to E-Wing, another close custody unit but with fewer restrictions, as soon as possible. Robert Gagnon's notes document that there would be a review of the close custody status in the next week. There would also be a review of whether to return James Quigley to Florida. He also recalls a decision that there would be an immediate response to some of Mr. Quigley's grievances over his living conditions;

117. Robert Gagnon called Jason Sawyer immediately after this conference call, He described the decisions that had been made. Jason Sawyer described this as significant progress and said that James Quigley would be pleased;

**Mr. Quigley's Death**

118. There was no communication between Mr. Sawyer and Mr. Quigley on October 6, 2003;

119. There was a management team meeting for D-Wing on October 6, 2003. The notes from that meeting concerning James Quigley state: "Per Super/Hatin inmate Quigley is to be placed in E unit ASAP/ this week." There is no evidence to indicate that anyone in the Department of Corrections communicated this information to James Quigley;

120. James Quigley wrote three letters during the last two days of his life. All three were delivered after his death, On October 5 he wrote a letter to attorney Jason Sawyer. The letter reads:

> 10-5-03
> Dear Mr. Sawyer:
> Now that the confusion has clear, the best I can do is roughly $11,000. Since that is well short of retainer quoted to me on Thursday please return the unused balance to my mother.
> It's too bad the philistines will win by default. Even though I am the unfortunate principal, this case would have been academically interesting for a number of reasons, and it could have set some sorely needed standards for Vermont corrections.
> Oh well, they have won the battle, but the war will continue. The tactics will necessarily have to change.
> Sincerely James Quigley

121. On October 6, he wrote a letter to attorney Paul Volk. The letter reads:

> 10-6-03
> Dear Mr. Volk:
> When we spoke on Thursday, I believe you state that AAG Gagnon advised you that I "was on the list." Although you did not specify precisely which "list" I was supposedly on, I assumed it was the list to be released from D-Wing to the general population.
> As it turned out, [inmate name deleted], who has been down here 6-weeks, was released yesterday. Today Steve Andrews made a new list of five, and two were released today. I am not, and have never been, on any list.
> 1 suspect these officials are lying to the department's lawyers, but of course, you probably don't find this surprising.
>
> Sincerely, James Quigley

122. On October 5, Mr. Quigley wrote his mother. The letter reads:

10-5-03
Dear Mom,
A letter from you arrived here last week, along with one from Aunt E. I read neither.
On Thursday, I spoke with Paul Volk and Jason Sawyer. They want $25,000 to take the case. Obviously, this is beyond my reach so I have instructed them to return the unused balance of the retainer to you.
A month ago I asked RJ to send him $2,500 and assuming this would be done, I had instructed Sawyer to refund the $2,500 that you had sent. For some reason my request of RJ was not honored.
Perhaps the reason was set forth in his letters of Sept. 8, 11 and 13, but I did not read them. In any event, it's irrelevant now.
Nothing has change (sic) here. Although Paul Volk says that assistant attorney general Gagnon claims I am "on the list." I'm not entirely sure just what "list" I'm supposedly "on," and in any case, it's irrelevant.
Tomorrow a brand new prison opens in southern Vermont. It looks like a torture joint. No free-world clothing (they supply everything), and 24-hour cell lights (pure torture). They probably think they're sending me there.
Two weeks ago, I got 4 injections in my back. They helped somewhat, but other than that, I've received no health care, in spite of numerous requests. There is still chronic pain, which has recently been exacerbated because it's been cold and rainy, and there is no heat whatsoever.
Yesterday there was a 30 mph wind to boot, and the windows in my cell won't close all the way, so it's been extremely cold (mid 40's) and damp. There is nothing to do but retreat under the covers and tremble because they won't provide us with adequate clothing or allow us to have our own clothing.
John Murphy was here last Wednesday, supposedly investigating someone's complaint that "conditions on D-Wing arc barbaric." My reaction was, "they're the worst I 've ever seen."
They're all full of crap. Spin is everything to these prison officials. It's all a front. In reality they are utterly evil and abusive. [DOC staff member] is a perfect example. [DOC staff member] is another. [DOC staff member] may be the worst of all. Too bad they win by default.

Love,
Jim


123. In his cell, in the early morning hours of October 7, Mr. Quigley committed

suicide;

124. James Quigley's cell was L-shaped. There was a 37 by 40 inch toilet area in

the back corner of the cell that could not be seen from the observation window in the

door to the cell. Near the ceiling in this area, there was a metal grate. James Quigley attached a portion of his bed sheet to this grate and hanged himself;

125. The policies governing D-Wing required that the guard on overnight duty check each inmate's cell every thirty minutes and make sure to see the inmate's skin. The purpose of this policy is to assure that the inmate is actually sleeping in bed. The policy protects against inmates placing objects under their sheets to simulate a sleeping person and then hurting or killing themselves in another part of the cell;

126. The night he died, James Quigley had placed books underneath his covers to simulate a sleeping person. James Quigley had gone to the corner of the cell that could not be seen from the window and hung himself. The guard who was assigned to check his cell did not follow the policy requiring that he see James Quigley's skin;

127. James Quigley died on the 82nd day of his confinement in D-Wing. He died on the 118th day of his confinement in either administrative segregation or close custody;

**Mental and Medical Health Care**

128. While on "D" wing, Plaintiff made repeated requests for medical and mental health care to treat symptoms caused by his being held in isolation;

129. Defendant's Department of Corrections, Matrix Health Systems, Dr. Paul Cotton, Paul Cotton, P.C. and others had a duty to provide Plaintiff with adequate mental and medical care;

130. Defendants Department of Corrections, Matrix Health Systems, Dr. Paul Cotton, Paul Cotton, P.C., and others knew Plaintiff faced a substantial risk of serious injury;

131. Defendants Department of Corrections, Matrix Health Systems, Dr. Paul Cotton, Paul Cotton, P.C., and others were deliberately indifferent to the known risk of substantial injury;

132. Defendants deliberate indifference was a proximate cause of Plaintiff's death;

133. Defendants Department of Corrections, Matrix Health Systems, Dr. Paul Cotton, Paul Cotton, P.C., and others failed to meet their duty to provide adequate mental and medical health services to Plaintiff;

134.  Defendants Department of Corrections, Matrix Health Systems, Dr. Paul Cotton, Paul Cotton, P.C. failed to adequately train and supervise their employees, agents, and others working on their behalf;

CAUSES OF ACTION

Count 1 - 42 U.S.C. § 1983 & Eighth Amendment

135. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 134;

136.  Defendants, and each of them, acting under color of state law, violated James Quigley's Eighth Amendment right against cruel and unusual punishment by placing him in administrative and close custody for a period of 118 days,  causing his mental health to deteriorate and causing him to commit suicide on October 6, 2003;

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

28

<u>Count 2 - 42 U.S.C. § 1983 & Eighth Amendment</u>

137. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 136;

138. Defendants, and each of them, acted under color of state law violated James Quigley's Eighth Amendment right  against cruel and unusual punishment  and were deliberately indifferent to a known risk of harm to Plaintiff.  Defendants' deliberate indifference to James Quigley's deteriorating mental health caused by the conditions of his confinement, and the risk of harm presented thereby, was the direct and proximate cause of James Quigley's suicide;

<u>Count 3 - 42 U.S.C . § 1983 & First, Fourth, Fifth , Fourteenth Amendments</u>

139. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 138;

140. Defendants, and each of them, acting under color of state law, violated James Quigley's rights under the First, Fourth, Fifth and Fourteenth Amendments by retaliating against him for filing grievances complaining about the conditions of his confinement and placing him in administrative and close custody for 118 days;

<u>Count 4 - 42 U.S.C. § 1985</u>

141. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 140;

142. The Defendants, in concert with each other and with other employees and/or agents of the Department of Corrections, conspired for the purpose of subjecting Mr. Quigley to cruel and unusual punishment in violation of his Eight Amendment rights;

143. The Defendants engaged in all of the overt acts alleged in this complaint, and others, in furtherance of the conspiracy;

144. The overt acts engaged in by the Defendants are evidence of an agreement among the Defendants and they were related to the promotion of the conspiracy;

### Count 5 - 42 U.S.C. § 1986

145. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 144;

146. The Defendants had knowledge that the wrongs conspired to be done were about to be committed by one or more of the other defendants and/or other employees or agents of the Department of Corrections;

147. The Defendants had the power to prevent or aid in preventing the commission of the wrongs;

148. The defendants neglected or refused to prevent or aid in the preventing the wrongs;

149. The wrongful acts were committed;

150. As a result, Plaintiff suffered pain and physical and mental injury;

SLEIGH & WILLIAMS

ATTORNEYS AT LAW

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

30

### Count 6 - Outrageous Conduct

151. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 150;

152. By their acts and omissions, the Defendants acted outrageously and caused Plaintiff to suffer severe emotional distress;

### Count 7 - Medical Malpractice - 12 V.S.A. § 1908

153. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 152;

154. Defendants failed in their duty to provide medical and mental health care which met the standard of care to which Plaintiff was entitled.

WHEREFORE, Plaintiff demands a jury trial on the foregoing complaint and prays this Honorable Court to award the Estate damages, including punitive damages, costs and attorney's fees as justice requires.

DATED at St. Johnsbury in the County of Caledonia on October _13_, 2004.

Respectfully submitted,

David C. Sleigh
Counsel for Plaintiffs